IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| WILLIAM THOMAS BARNES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:13CV337 |
| | ) | |
| DUANE TERRELL, | ) | |
| | ) | |
| Respondent. | ) | |

RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Petitioner William Thomas Barnes, a prisoner of the State of North Carolina serving a

life sentence following his conviction for first-degree murder, brings *pro se* a Petition [Doc. #1]

seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has moved for

summary judgment [Doc. #22], and Petitioner has responded [Doc. #25]. For the reasons set

out below, the Court recommends that Respondent's motion be granted and that this action be

dismissed.

The basic facts and procedural background underlying the Petition, as set out by the

Supreme Court of North Carolina during Petitioner's direct appeal, are as follows:

> The evidence presented by the State at trial tended to show the following. On the
> night of 31 October 1990 at 9:08 p.m., Lieutenant Jerry Pulliam of the Eden
> Police Department received a call to go to the Central Body Shop on Stadium
> Drive in Eden, North Carolina. When he arrived at 9:12 p.m., he observed off-
> duty Officer Ronald Brown kneeling on the ground beside the victim, Jessie
> William Lemons, who had been shot. Lieutenant Pulliam then saw Ms. Marla
> Rodgers, who had placed the call for help, standing in front of the doorway of the
> body shop, screaming and yelling hysterically.
>
> When Lieutenant Pulliam arrived, the victim could not speak. There was blood
> on his clothing, and Lieutenant Pulliam concluded from his examination that the

victim had multiple gunshot wounds that appeared to have been made by a small-caliber weapon. In the victim's pants pocket, Lieutenant Pulliam found a wallet containing $1,325.59. Lieutenant Pulliam opined that the victim was no longer alive at the time the ambulance arrived.

Ms. Marla Rodgers knew the victim, with whom she had had an ongoing relationship for over ten years. Ms. Rodgers also knew defendant, William Thomas Barnes. She had a relationship with him beginning in the spring of 1990, and she cohabited with him for a short period of time later that summer when she and the victim "had some problems." During the time that Ms. Rodgers was living with defendant in early August of 1990, the victim came to visit her at defendant's mother's convenience store, where she and defendant were working. The victim asked Ms. Rodgers if she would come outside and talk to him, and she did so. While the two of them were outside talking, defendant came outside and asked Ms. Rodgers if everything was okay, and she told him everything was fine.

A few days later, Ms. Rodgers stopped living with defendant in Greensboro and moved back in with the victim in Eden. Ms. Rodgers stayed in Eden with the victim only about a week because defendant began calling and arguing with the victim. There were many calls and arguments between defendant and the victim. After defendant would call and argue with the victim, the victim would argue with Ms. Rodgers. Ms. Rodgers then left the victim and moved back in with defendant in Greensboro.

Around 1 September 1990, Ms. Rodgers took a trip to Florida with the victim. She had learned that she was pregnant with his child, and they took the trip to "sort things out." When they returned from Florida, Ms. Rodgers stayed with the victim at his home in Eden. However, they had an argument about her pregnancy the day after they got back, so Ms. Rodgers left the victim's house again and moved back to Greensboro to stay with defendant.

Ms. Rodgers told defendant that she had decided to abort her pregnancy. Defendant was "very much against" the abortion, believing the child to be his own. Defendant told Ms. Rodgers that if she had the abortion, "[the victim] would have the blood of his [defendant's] child on his hands." In mid-September, Ms. Rodgers aborted the pregnancy at a clinic in Greensboro. She stayed with the victim at his home in Eden after the abortion. After four or five days, Ms. Rodgers went back to defendant's home in Greensboro and stayed there for about a week. Defendant became angry whenever the victim's name was mentioned and said that when the victim had come to the store on that prior occasion, "he should have went ahead and shot him then." Ms. Rodgers then returned to the victim's house.

2

On 22 October 1990, while Ms. Rodgers was staying at the victim's house, defendant called her several times. Defendant told Ms. Rodgers that he was at the Draper Club Market and that if she would not meet him, he was going to the shop to kill the victim. Ms. Rodgers met defendant at a shopping center. Defendant got in Ms. Rodgers' car with a "pistol-type gun" "wrapped in a cloth with his bag." Defendant said, "Take me to the damn shop. . . . I want to kill that old son-of-a-bitch." Defendant told her that he knew where the victim lived and that he knew which bedroom the victim and Ms. Rodgers slept in. Ms. Rodgers convinced defendant to drive around and talk for a while, and then they drove to defendant's home in Greensboro. Ms. Rodgers stayed there with defendant for about a week.

Ms. Rodgers decided to leave defendant on 29 October 1990. When she told him she was leaving, he hit her and choked her in an attempt to prevent her from going. Defendant told Ms. Rodgers that he was going to kill the victim, and he said more than once that she would be "going to a funeral." Defendant jerked some wires out of Ms. Rodgers' car to prevent her from leaving, so Ms. Rodgers ran to a service station and called the victim, who came and picked her up.

On the evening of 31 October 1990, Ms. Rodgers and the victim went to K-Mart to buy some candy and other items for his son's birthday. They left the K-Mart as it was closing at 9:00 p.m. and went to the Central Body Shop, which was owned by the victim. When they were ready to leave, the victim went outside to start the car. Ms. Rodgers remained inside the shop. She heard three "popping sounds" from the outside, ran out, and saw the victim lying on the ground on his back. The victim said, "That son-of-a-bitch shot me." Ms. Rodgers called 911 and the victim's daughter.

Ms. Rodgers knew that defendant kept guns in his house. She testified that "he had a small gun that he carried in his pouch, and there were some guns upstairs, like shotgun, rifle-type guns, and then there were other guns, like paint guns." Defendant used the paint guns to play a game called "paintball," about which he had authored a book. The paintball game involves players divided into two teams, each with a base and a flag; the object of the game is to capture the other team's flag and to eliminate opposing players by shooting them with paintballs. Ms. Rodgers once played this game with defendant in some woods in Mebane, North Carolina.

William F. Nicely testified that he worked at Ed's Gun Shop in Southern Pines, North Carolina. Mr. Nicely identified a federal form used when buying a weapon. The form reflected the sale of a Browning .22-caliber semiautomatic rifle, serial number 01244PN146, by Ed's Gun Ship to a Charles Howard Lockmuller Jr. on

19 February 1989. Charles Howard Lockmuller testified that he purchased the rifle from Mr. Nicely and that he sold the rifle to defendant in July or August of 1990. The serial number of the rifle, which was listed on the federal form, matched the serial number on a Browning rifle box found in defendant's home.

Dr. Anthony Macri, pathologist at Morehead Hospital in Eden, testified as an expert in forensic pathology. He performed an autopsy on the victim on 1 November 1990. The victim was sixty-five years of age. There were three gunshot wounds. Two bullets had passed through the body. A third bullet had entered and was still lodged in the body. The cause of death was a gunshot would to the chest and massive injury to the heart. Dr. Macri recovered a bullet lodged in the wall of the abdomen, and another bullet was recovered from the victim's clothing by a nurse in the emergency room. A detective with the Eden Police Department recovered the third bullet when it fell out of the coat worn by the victim on the night of the shooting.

Thomas Trochum, Special Agent with the State Bureau of Investigation and forensic firearms examiner, identified the goldcoated Remington brand .22-caliber, long rifle-fired bullets that had been retrieved from the victim and submitted to the laboratory on 2 November 1990. In his examination of the bullets, Agent Trochum found that "all were of six lands and grooves; their twist was to the right." Agent Trochum testified that he measured the bullets and that they were all consistent. The land impression was approximately forty thousandths of an inch wide; the groove impression was approximately seventy thousandths of an inch wide. "What that meant is that they could have all been fired from the same firearm." Agent Trochum opined that the bullets could have been fired from the Browning rifle purchased by defendant from Mr. Lockmuller.

A witness testified that on the morning of 30 October 1990, as she was driving down Stadium Drive in Eden below the Central Body Shop, she saw a person walking at a place "you rarely see anyone walking." The individual was wearing blue jeans and a plaid "outdoor-type" shirt. Later, when the witness saw a picture of defendant in the *Eden Daily News*, she recognized the picture "immediately as the man [she] had seen."

Two witnesses, Timmy Saunders and Billy Richardson, testified that on the afternoon of 1 November 1990, they were hunting on Fieldcrest Farm, which is located behind the Central Body Shop. Mr. Sanders found a blue backpack about ten yards from his deer stand. Mr. Sanders thought that the backpack belonged to another hunter and did not open it. Mr. Sanders testified that the blue backpack identified in court by Ms. Rodgers as belonging to defendant looked like the one he had seen in the woods. Mr. Richardson testified that he saw a

4

man coming through the woods wearing "blue jeans and a checked shirt, or either a flannel jacket." The man had a knife on his side, a water bottle, and a black hat on his head. Upon seeing Mr. Richardson, the man jumped behind a tree, and then, after about five minutes, the man walked away. Mr. Richardson saw the photograph of defendant in the *Eden Daily News* and thought the photograph "kind of resembled" the person in the woods. Mr. Sanders also showed Mr. Richardson the blue backpack, and Mr. Richardson told Mr. Sanders to leave the pack where they had found it.

Michael Cullifer testified that on 2 November 1990, when he arrived home at his cabin in Craig County, Virginia, after work, he found defendant asleep on the couch. Defendant was dressed in jeans and a shirt and had a blanket as a cover. Mr. Cullifer asked defendant who he was, and defendant said that he was a friend of Mr. Cullifer's cousin. When Mr. Cullifer's cousin, Michael Woods, came to the cabin, he and defendant left together. Mr. Woods testified that on 2 November, defendant was dressed in blue jeans and a flannel shirt, and his belongings consisted of "a backpack and a blanket and pillow." Mr. Woods allowed defendant to shower and shave at his house. Defendant stayed with Mr. Woods for two days. When defendant was leaving, Mr. Woods discovered that defendant had left his backpack in a bedroom used for storage. Mr. Woods identified the same blue backpack previously identified by others as defendant's. Mr. Woods subsequently gave the backpack to police officers.

Thomas Johnson Byars, a friend of defendant, saw defendant at his (Mr. Byars') house in South Carolina on Sunday, 4 November 1990. Defendant left on the following Tuesday, telling Mr. Byars that the rental car was due back and that he had to get back in order to vote.

A search of defendant's apartment revealed an array of weapons, a rifle, gun boxes, and ammunition.

State v. Barnes, 430 S.E.2d 914, 915-18 (N.C. 1993) (footnote omitted).

The North Carolina Supreme Court also relied upon a letter that Petitioner wrote while he was in prison awaiting trial. In the letter, he asked his sister, Shara, to get an accomplice, two bulletproof vests, two Ruger 10/22 assault pistols and to wait alongside the highway that would be used in transferring Petitioner to Central Prison in Raleigh, N.C. Id. at 918. He told her to follow the prison transport van, stop it "at a preselected spot . . . and then both you get out and

5

waste the bastards." Id. In the letter, Petitioner also accused his sister of "chickening out" and said that if only she had followed directions he would not be "in this mess." Id. Petitioner denied killing the victim, however.

The Supreme Court of North Carolina found no error in Petitioner's conviction. The court rejected Petitioner's arguments that the State's evidence at trial was insufficient as a matter of law to support his conviction for first-degree murder, that the State was bound by Petitioner's exculpatory statements in the letter he wrote to his sister, and that the jury was improperly instructed on how the evidence of flight could be considered.

Petitioner then filed four motions for appropriate relief ("MAR") in state court, all of which were denied.[1] The court granted Petitioner an evidentiary hearing in one MAR on his claim that Ms. Rodgers had recanted her trial testimony, but relief was ultimately denied on that claim. Petitioner then filed the present habeas corpus petition.

Petitioner's Claims

Petitioner raises two grounds for relief in his petition. First, Petitioner claims that counsel rendered ineffective assistance because Petitioner might suffer from Asperger's Syndrome, an autism-like disorder, that could not have been diagnosed at the time of his trial, which resulted in a due process violation. (Petition [Doc. #1].) In his second ground for relief, Petitioner asks for another chance to ask one of the investigators, Mike Martin, to admit to

---

[1] Petitioner raised his present claims in a MAR filed on February 4, 2013 (Br. [Doc. #23], Ex. 13.) The Rockingham County clerk of court's office responded to him saying that his MAR was forwarded to Judge Wilson's office, but that he "is not going to consider it due to the enclosed order dated April 28, 2008." (Id. Ex. 14.) The letter further states, referring to that order, that "[i]n #2 there is a 'BAR to any other claims, assertions, petitions, or motion that he might hereafter File in this case, pursuant to G.S. 15a-1419.'" (Id.) Petitioner then filed a Petition for Writ of Certiorari in the North Carolina Supreme Court, which was denied on April 11, 2013. (Id. Exs. 15, 16.)

planting unspecified evidence against him.  (Id.)  Petitioner states in a later filing, however, that

Mr. Martin is now deceased and that this ground for relief is "now moot."  (Response Br. [Doc.

#25] at 6.)  Therefore, the Court considers this second ground for relief to be withdrawn by

Petitioner and will address only the first claim.[2]

## Standard of Review

This Court must apply a highly deferential standard of review in connection with habeas

claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d).  More

specifically, the Court may not grant relief unless a state court decision on the merits "was

contrary to, or involved an unreasonable application of clearly established Federal law, as

determined by the Supreme Court of the United States; or . . . was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."  Id.

"Clearly established Federal law" includes only "'holdings, as opposed to dicta,'" of the United

States Supreme Court.  White v. Woodall, 134 S.Ct. 1697, 1702 (2014) (quoting Howes v. Fields,

132 S.Ct. 1181, 1187 (2012)).  To qualify as "contrary to" United States Supreme Court

precedent, a state court decision either must arrive at "a conclusion opposite to that reached by

[the United States Supreme] Court on a question of law" or "confront[] facts that are materially

indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a result

---

[2] The Court notes that to the extent the second claim is not withdrawn, it is barred by the statute of limitations in any event.  As noted in Respondent's Brief, Petitioner was sentenced on February 14, 1992, and his conviction and sentence were upheld on direct appeal by order of the North Carolina Supreme Court on July 2, 1993.  To the extent Petitioner's second claim is related to a subsequent MAR, the hearing on that MAR was held on December 4, 1998, the MAR was ultimately denied on April 29, 1999, and the North Carolina Supreme Court denied certiorari on October 3, 2002.  Any issues related to the second claim were known to Petitioner by that time at the latest, but Petitioner did not file a further state MAR on this issue for over 5 years, until February 27, 2008, and did not file the present Petition for over 10 years, until April 24, 2013.  Thus, the second claim is clearly outside the one-year statute of limitations contained in 28 U.S.C. § 2244(d)(1).

opposite" to the United States Supreme Court. <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000).

A state court decision "involves an unreasonable application" of United States Supreme Court case law "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407; <u>see also</u> <u>id.</u> at 409–11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous"). "[E]ven clear error will not suffice." <u>White</u>, 134 S.Ct. at 1702 (citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75–76 (2003)). "Rather, 'as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" <u>Id.</u> (quoting <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011)). Finally, this Court must presume state court findings of fact correct unless clear and convincing evidence rebuts them. 28 U.S.C. § 2254(e)(1).

Discussion

In this case, Respondent's primary argument is that Petitioner's claims of ineffective assistance of counsel and of a due process violation are too unsupported and conclusory to merit relief. (Br. [Doc. #23] at 8-10.) In order to prove ineffective assistance of counsel, a petitioner must establish, first, that his attorney's performance fell below a reasonable standard for defense attorneys and, second, that he was prejudiced by this performance. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). As to the first prong, a petitioner bears the burden of affirmatively showing deficient performance. <u>See</u> <u>Spencer v. Murray</u>, 18 F.3d 229, 233 (4th Cir.

8

1994).  As to the second prong, to establish prejudice, a petitioner must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.  <u>Strickland</u>, 466 U.S. at 694.  Moreover, the habeas petition "is expected to state facts that point to a real possibility of constitutional error."  <u>Blackledge v. Allison</u>, 431 U.S. 63, 75 n.7 (1977).  "Unsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing."  <u>Nickerson v. Lee</u>, 971 F.2d 1125, 1136 (4th Cir. 1992).

Here, Petitioner's claim relies upon his allegation that he <u>might</u> have Asperger's Syndrome and that his attorney failed to raise a potential "psychological defense."  However, Petitioner concedes "that it's true I don't know, for certain, that I am Asperger's." (Response Br. [Doc. #25] at 7.)  His suspicion that he might have Asperger's Syndrome arises from his own review of a check-list of symptoms and his belief that he has experienced over three-quarters of the symptoms.  (<u>Id.</u>)  Petitioner alleges that he has attempted to get tested for Asperger's Syndrome in prison, but has not been successful.  Therefore, there is no evidence that Petitioner actually suffers from Asperger's Syndrome.

Moreover, even if Petitioner were diagnosed as having Asperger's Syndrome, there is no showing of any likelihood that such a disorder affected Petitioner's trial and conviction for murder.  Petitioner argues that his trial counsel should have had the opportunity to consider a "mental defense" based upon Asperger's.  (<u>Id.</u> at 9.)  He does not give any more details about such a defense or show that it would have any likelihood of changing the result of his trial.  To the extent Petitioner asserts an ineffective assistance claim, counsel cannot be faulted for not investigating whether Petitioner suffered from Asperger's Syndrome when there was no

evidence or even suggestion at the time of trial that he suffered from a mental disorder. And, Petitioner cannot show any prejudice in failing to raise such a "mental defense" at trial, given the failure to show any likelihood of an effect on his conviction. Therefore, Petitioner has not established a claim for ineffective assistance of counsel. Moreover, to the extent Petitioner brings this claim as a general "due process" claim based on what he contends is newly discovered evidence, it is not clear that Petitioner is asserting an underlying constitutional claim, and the failure to show any likelihood of an effect on his conviction causes his due process claim to fail in any event.

Because Petitioner fails to state any facts that point to a real possibility of constitutional error in his conviction, and because his claim is completely unsupported and conclusory, he is not entitled to an evidentiary hearing on his claim. See Blackledge, 431 U.S. at 75 n.7; Nickerson, 971 F.2d at 1136. Respondent's other arguments for summary judgment need not be addressed given these defects.

IT IS THEREFORE RECOMMENDED that Respondent's Motion for Summary Judgment [Doc. #22] be granted, and that the Petition [Doc. #1] be denied, and that this action be dismissed.

This, the 12th day of August, 2015.

                                      /s/  Joi Elizabeth Peake
                                    United States Magistrate Judge

10